Kenneth J. WILSON, Plaintiff–Appellee,

v.

SAINTINE EXPLORATION AND DRILLING CORPORATION and the Estate of Robert D.P. Welch, Fred A. Rodolfy and Ruffa & Hanover, P.C., Defendants.

Appeal of RUFFA & HANOVER, P.C., Defendant.

No. 357, Docket 87–7357.

United States Court of Appeals, Second Circuit.

Reargued Oct. 20, 1988.

Decided April 5, 1989.

Robert E. Meshel, D'Amato & Lynch, New York City, for defendant Ruffa & Hanover, P.C.

Jonathan B. Altschuler, New York City, for plaintiff-appellee Kenneth J. Wilson.

Daniel L. Goelzer, Gen. Counsel, Securities & Exchange Com'n, Washington, D.C. (Jacob H. Stillman, Associate Gen. Counsel, Thomas L. Riesenberg, Sr. Sp. Counsel, Rada L. Potts, Atty., Paul Gonson, Sol., S.E.C., Washington, D.C., of counsel), amicus curiae.

Before TIMBERS, WINTER and MAHONEY, Circuit Judges.

WINTER, Circuit Judge:

We have vacated our prior opinion in this matter, reported at 844 F.2d 81 (2d Cir. 1988), so that the parties might rebrief and reargue the case in light of *Pinter v. Dahl,* — U.S. ——, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). In view of the suggestion in Judge Timbers' dissent, we invited the Securities and Exchange Commission ("SEC") to file a brief *amicus curiae.* We now affirm our original holding, though on the rather different grounds required by *Pinter.*

## BACKGROUND

We assume familiarity with our prior opinion and summarize only the salient facts here. In March 1981, Fred Rodolfy suggested to appellee Kenneth Wilson that Wilson invest in the stock of Saintine Exploration and Drilling Corporation ("Saintine"), a concern of which Rodolfy was a

principal shareholder and chairman. Early in April, Wilson received a private placement memorandum and a subscription package for the private offering of one million shares of Saintine common stock. These offering materials had been prepared by Saintine's counsel, Ruffa & Hanover, and were accompanied by a cover letter on Ruffa & Hanover stationery stating that the materials were being sent to Wilson at the request of Rodolfy and the president of Saintine, Robert Welch. Wilson received a revised private placement memorandum in mid-April that did not differ in any material respect from the original memorandum. The private placement memoranda contained a misrepresentation in stating that Saintine had already purchased the rights to explore and develop certain oil and gas interests in Honduras. No agreement to purchase those rights was reached, however, until May 27, 1981. On May 7, 1981, Wilson purchased 90,000 shares of Saintine stock for $36,000. Saintine never embarked on the promised drilling program for reasons unrelated to the misrepresentation. In early 1982, Rodolfy telephoned Wilson to inform him that Welch would refund his investment. Only $5,000 was ever refunded, however.

As stipulated by the parties, testified to by Wilson at trial, found by the district court and reaffirmed by Wilson's counsel at the most recent oral argument, Ruffa & Hanover's cover letter accompanying the original private placement memorandum constituted the only direct contact between Ruffa & Hanover and Wilson. Wilson's counsel assured us at that argument, moreover, that he has no other evidence concerning Ruffa & Hanover's participation and does not desire a remand.

In our previous opinion, we held that Ruffa & Hanover was not liable for Wilson's loss under Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2) (1982). We recognized that although Ruffa & Hanover was not a "person who ... offers or sells a security," it was potentially liable under Section 12(2) as a collateral participant. *See Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir.1973) (in banc). *Lanza* stated, however, that the standard of liability dictated by the language of Section 12(2), reasonable care, applied only to actual sellers in privity with the plaintiff and that scienter had to be shown to hold collateral participants liable. *Id.* at 1298. In that context, our prior decision in the instant matter held that loss causation was also an element of an action against collateral participants under Section 12(2). We concluded that, because the misrepresentation was unrelated to Wilson's loss, Ruffa & Hanover was not liable under Section 12(2).

On June 7, 1988, the panel denied by a two-to-one vote, Judge Timbers dissenting, a petition for rehearing. Subsequent to that denial, the Supreme Court addressed the meaning of the words "[a]ny person who ... offers or sells a security," as used in Section 12(1) of the Securities Act of 1933, 15 U.S.C. § 77*l* (1) (1982). Because this language is identical to the language of Section 12(2), we decided to reconsider our decision in light of *Pinter*.

## DISCUSSION

*Pinter* involved the threshold question of the meaning of "[a]ny person who ... offers or sells a security" as that phrase is used in Section 12(1). It expressly held that only statutory "sellers" may be liable under Section 12(1) and that collateral participants who do not solicit sales cannot be liable under Section 12(1) whether or not loss causation is proven. *Pinter* thus stated that, although privity is not essential, "the language of Section 12[1] contemplates a buyer-seller relationship not unlike traditional contractual privity." *Pinter*, 108 S.Ct. at 2076. The Court went on to include as statutory sellers only those who actually solicit the sale of securities for financial gain. *Id.* at 2079. The opinion expressly rejected various tests that have been utilized by courts to include non-soliciting collateral participants as defendants in actions under Section 12(1) even where those participants were essential to the transaction. It thus stated,

[t]here is no support in the statutory language ... for expansion of § 12(1) primary liability beyond persons who

pass title and persons who 'offer,' including those who 'solicit' offers. Indeed, § 12's failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that the section impose liability on participants collateral to the offer or sale.

*Id.* at 2080. The opinion went on to explain that even if a plaintiff were to prove causation, presumably including loss causation, that would be insufficient to hold someone liable under Section 12(1) who had not solicited sales. *Id.* at 2081. ("Further, no congressional intent to incorporate tort law doctrines of reliance and causation into § 12(1) emerges from the language or the legislative history of the statute.").

■ The *Pinter* court expressly limited its holding to Section 12(1) and reserved decision on whether the identical language of Sections 12(1) and 12(2) has a common meaning. *Id.* at 2076 n. 20. We have held, however, that the two sections are identical in meaning, *Schillner v. H. Vaugham Clarke & Co.*, 134 F.2d 875 (2d Cir.1943), and that *Pinter* applies to Section 12(2). *Capri v. Murphy*, 856 F.2d 473 (2d Cir. 1988). We are thus obliged to consider the implications of *Pinter* for our caselaw under Section 12(2).

Those implications are twofold, in part expanding, and in part contracting, the category of persons potentially liable under Section 12(2). To reiterate, our prior caselaw distinguished between persons in privity with a buyer and collateral participants in the transaction. *Lanza*, 479 F.2d at 1298. Those in privity were subject to the literal terms of Section 12(2), including liability for negligent misrepresentation. In contrast, collateral participants could be held liable only if they had scienter, *id.*, and, under our prior opinion in this case, loss causation was shown.

Persons who are not in privity with the plaintiff but who would have been collateral participants under our former caselaw will now be statutory sellers within the meaning of *Pinter* if they solicited the sales in question for a financial gain. Such persons may now be liable under Section 12

whether or not scienter or loss causation is shown. For example, in *Mayer v. Oil Field Systems Corp.*, 803 F.2d 749 (2d Cir. 1986), a partnership's general partners fulfilled their pay-out obligation to limited partners by exchanging all shares of the partnership for stock of another entity. That stock traded at a disappointing price, and the limited partners sued. We held that the general partners were not in privity with the limited partners and were thus collateral participants. Because they lacked scienter, they could not be liable under Section 12(2). 803 F.2d at 756. Had *Mayer* been decided under the *Pinter* standard, however, we would have had to consider, not whether the general partners had scienter, but whether their causing the exchange for financial gain was the legal equivalent of solicitation of a sale.

In another respect, *Pinter* contracts the category of persons potentially liable under our Section 12(2) caselaw. After *Pinter*, some persons who are not in privity with the plaintiff but who would have been collateral participants under our prior caselaw are now not statutory sellers because they did not solicit the sales in question. Such persons are no longer subject to any liability under Section 12.

It is clear that Ruffa & Hanover falls within the category of participants whose potential liability is contracted rather than expanded by *Pinter*. Wilson expressly concedes that the firm's participation in the sale consisted solely of the ministerial act of mailing a copy of the private placement memorandum to Wilson at Rodolfy's request. That cannot under any view be considered the kind of solicitation necessary under *Pinter*. It is clear from the Court's opinion that its concern had to do with persons such as brokers who might act on the seller's behalf for a profit. *See Pinter*, 108 S.Ct. at 2082. Moreover, *Pinter* expressly cautioned that the draconian provisions of Section 12 must not be extended to include lawyers, such as Ruffa & Hanover, who have performed only their usual professional functions in preparing documents for an offering. 108 S.Ct. at 2081. Indeed, Justice Blackmun's opinion

expressly disapproved of the rationale of the leading decision of this circuit, *Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1053 (2d Cir.1969), holding a lawyer liable under Section 12(1), in circumstances in which the lawyer had actual contact with the purchaser. *Id.* 108 S.Ct. at 2081, n. 27. Of course, it does not follow that lawyers are exempt from the concept of a "seller" under Section 12 where they earn a commission from an actual seller for persuading their clients to make a particular investment. *Cf. Brady v. duPont*, 828 F.2d 75, 77 (2d Cir.1987).

Wilson seeks support from footnote 24 of the *Pinter* decision, which states that the Court did not rule upon the existence of aider and abettor liability under Section 12, citing the decisions in *Mayer* and *In re Caesar's Palace Securities Litigation*, 360 F.Supp. 366 (S.D.N.Y.1973). Our prior caselaw, however, made no distinction under Section 12 between liability based on aiding and abetting and liability based on collateral participation. Indeed, it treated the terms as synonymous and used them interchangeably, as the *Caesar's Palace* opinion stated. 360 F.Supp. at 380. We agree with the *amicus* brief filed by the SEC that persons who do not meet the *Pinter* test for statutory sellers may not be held liable under Section 12 as aiders and abettors.

As the SEC's brief notes, aiding and abetting liability originated in criminal and tort law and is inappropriate under Section 12. As that brief states:

> Section 12(2) does not permit an analogy to tort or criminal law. The provision merely imposes civil liability on a statutory seller in favor of an aggrieved investor; it neither defines violations nor makes certain acts unlawful. As a result, a criminal law analogy is not available [citation omitted]. Likewise, the Section, based on recission, is not derived from tort law principles, making the tort

theory employed in the context of Section 10(b) inapplicable.

Brief of the Securities and Exchange Commission at 19. We agree. We also agree with the SEC that aiding and abetting liability under Section 12 would be wholly "anomalous" in light of *Pinter*, because such liability "is likely as broad as, if not broader than, the ... similar tests rejected by the Pinter court." *Id.* at 20. *Pinter* would indeed be unworthy of Supreme Court attention if aiding and abetting liability existed under Section 12(2) because all non-selling collateral participants insulated by *Pinter* would nevertheless be liable as aiders and abettors.

■ Our reconsideration thus leads to the conclusion that Ruffa & Hanover cannot be held liable under Section 12(2), whether or not loss causation is proven, because Ruffa & Hanover did not solicit the sale in question. This conclusion does not alter either our earlier result or the legal standards under which non-selling collateral participants may be liable in this circuit. In our original opinion, we held that a suit against a collateral participant under Section 12(2) had to meet the requirements of a Section 10(b) action. *Pinter*'s holding that collateral participants who do not solicit sales cannot be held liable under Section 12(2) in no way diminishes their potential liability under Section 10(b).

We therefore affirm. We also vacate the panel's previous denial of the petition for rehearing. Wilson is of course free to file a new petition for rehearing and suggestion for rehearing in banc.[1]

TIMBERS, Circuit Judge, dissenting:

This is the latest, but probably not the last, chapter in this "wondrous strange" case.[1]

The ultimate issue is whether a defrauded purchaser of securities (plaintiff Kenneth J. Wilson) may recover under § 12(2)

---

**1.** After this appeal was first heard, we affirmed the judgment against Rodolfy by summary order on the ground that he was clearly a seller within the meaning of Section 12(2). The mandate has issued as to Rodolfy, and the judgment against him is not affected by our reconsidera-

tion of our prior opinion concerning Ruffa & Hanover.

**1.** So characterized by a member of our Court—not the author of this dissent.

of the Securities Act of 1933, 15 U.S.C. § 77*l* (2) (1982), the $47,513.40 awarded to him by the district court, in view of what the district court found to be the concededly egregious fraud committed by a Manhattan law firm (defendant Ruffa & Hanover, P.C.) in preparing and distributing a private-placement memorandam in connection with the sale of the securities.

I would either affirm the judgment of the district court or at least remand the case to the district court to make appropriate findings of fact and conclusions of law in the light of *Pinter v. Dahl*, 486 U.S. ——, ——, 108 S.Ct. 2063 (1988), which was decided long after the decision of the district court in the instant case. From the refusal of the majority to do either, I respectfully dissent.

### I.

Emerging from the morass of prior proceedings in this case,[2] we are confronted with the novel and startling procedure devised by the majority, in its puzzling struggle to avoid a remand to the district court, of dealing with the district court's decision by piggy-backing it on a phantom record in order to apply *Pinter* to the instant case. The record before us contains no findings of fact or conclusions of law whatsoever by the district court on the *Pinter* issue; nor was the district court afforded any oppor-

tunity to make findings of fact or conclusions of law on that issue. This strikes me as a wholly unacceptable and dangerous course of procedure, leading inevitably, as it has here, to appellate fact finding. The Supreme Court in *Pinter* had this to say regarding the absence of findings by the district court on a critical issue in that case:

> "The District Court made no findings that focused on whether Dahl urged the other purchases in order to further some financial interest of his own or of Pinter. Accordingly, further findings are necessary to assess Dahl's liability."

486 U.S. at ——, 108 S.Ct. at 2083 (footnote omitted). Moreover, in another § 12(2) case decided by our Court subsequent to *Pinter* the panel remanded the case to the district court for findings of fact on the issue of a party's potential solicitation where the party had "played a major role in setting up the ... venture", but whose contacts with the buyers were uncertain. *Capri v. Murphy*, 856 F.2d 473, 478–79 (2 Cir.1988). Here, although defendant's contact with plaintiff is known, defendant's role in the venture is not clear and should be determined on remand.

### II.

As stated above, at the time the district court made its findings of fact in the in-

---

**2.** The original appeal was argued before us in November 1987. Four and a half months later, in April 1988, the panel opinion was filed. 844 F.2d 81. The majority held, in an abstruse opinion of doubtful validity and in the teeth of square authority to the contrary, that loss causation was an essential element of an action against a collateral participant under § 12(2); and accordingly they reversed the district court. I dissented. 844 F.2d at 86.

More than four months later, on August 24, 1988, the majority entered a two-judge order vacating their majority opinion which had been published in F.2d. In the same order, the majority directed that the appeal be rebriefed and reargued in the light of *Pinter*. This two-judge order was never submitted to me as a member of the panel and was entered without my knowledge or consent. I later made it clear that I agreed with that part of the August 24 order which vacated the original panel majority opinion, but that I disagreed with that part of the order which directed the parties to rebrief and reargue the appeal without remanding the case

to the district court for new findings of fact and conclusions of law in the light of *Pinter*.

Aside from the inherent invalidity of the original majority panel opinion, the majority's decision to vacate their own opinion undoubtedly was triggered by the Supreme Court's opinion of June 15, 1988 in which the Court held that "no congressional intent to incorporate tort law doctrines of reliance and *causation* into § 12(1) emerges from the language or the legislative history of the statute. Indeed, the strict liability nature of the statutory cause of action suggests the opposite. See Douglas & Bates, [*The Federal Securities Act of 1933,*] 43 Yale L.J. [171,] 177 [ (1933) ]." *Pinter, supra,* 486 U.S. at ——, 108 S.Ct. at 2081 (emphasis added).

In the meanwhile, two en banc polls were conducted in our Court and innumerable draft opinions and dissents were circulated on the petition for rehearing which eventually was denied in June 1988.

The reargument in light of *Pinter* took place in October 1988 and the instant panel opinions followed.

stant case, *Pinter* had not been decided, and the district court followed Second Circuit law as set forth in *Katz v. Amos Treat & Co.*, 411 F.2d 1046 (2 Cir.1969). It held that, since the law firm Ruffa & Hanover had materially participated in the securities transaction with the required scienter, it was liable under § 12(2) as an aider and abettor,[3] rather than as a seller as that term was then defined. An examination of what appear to be the requirements of *Pinter*, however, strongly indicates that the facts necessary properly to apply its analysis were not found by the district court in the instant case.

In *Pinter*, the Court construed the language "[a]ny person who offers or sells a security" found in § 12(1)[4] of the Securities Act of 1933, which delineates liability for selling certain unregistered securities. 15 U.S.C. § 77*l*(1) (1982). The Court held that, while it was clear that this language imposes liability on an owner who passes title or offers to pass title in a security for value, liability also will extend to certain people who solicit an offer to buy. *Pinter*, *supra*, 486 U.S. at ——, 108 S.Ct. at 2076. Since Ruffa & Hanover were not the owners of the securities sold in the instant case, if *Pinter* applies the firm would be liable only if it were found to have solicited the sale.

*Pinter* does not define solicitation beyond stating that it is not solicitation to recommend the purchase of a security solely to benefit the buyer. "[L]iability extends *only* to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 2079 (emphasis added). It also is clear that mere participation in the solicitation by another is not solicitation, *id.* at 2081 n. 27, which is why lawyers performing "only ... their professional services" are not liable under § 12. *Id.* at 2081. The proper focus of the analysis appears to be on "the defendant's relationship with the

plaintiff-purchaser", rather than "the defendant's degree of involvement in the securities transaction and its surrounding circumstances". *Id.*

The district court's findings of fact show that they are limited to those necessary to apply Second Circuit law as it then existed. Indeed, they are limited almost entirely to a finding that the confidential private placement memorandum contained a false material statement, that Ruffa & Hanover knew the statement to be false, and that it engaged in the material participation necessary to establish aider and abettor liability under Second Circuit law. Accordingly, these findings focus on precisely the area the Supreme Court in *Pinter* found to be inapposite: Ruffa & Hanover's involvement in the securities transaction and its surrounding circumstances. What we know virtually nothing about is "the defendant's relationship with the plaintiff-purchaser", which is precisely what *Pinter* tells us we need to know.

I should think that our deficiencies in knowledge in these two areas should have led to a remand as a matter of course. Nevertheless, the panel majority attempts to avoid these deficiencies by relying on two "findings" of "undisputed facts" contained in the district court's pre-trial order, using these two findings *to supply a third finding of its own* that the law firm did not solicit Wilson. The two findings of the district court in its pre-trial order in their entirety are as follows:

"8. On April 1, 1981, at the request of Fred Rudolfy (sic) and Robert Welch, Ruffa & Hanover sent a copy of the Confidential Private Placement Memorandum for Saintine to plaintiff.

. . . .

18. Plaintiff Wilson never communicated either orally or in writing with any person in the law firm of Ruffa & Hanover."

---

**3.** The panel majority holds that in light of *Pinter* the Second Circuit's § 12 aiding and abetting doctrine no longer is good law. Majority opinion at 1127.

**4.** I agree with the panel majority that *Pinter* applies to § 12(2), Majority Opinion at 1126. As to how it applies, however, is a different matter.

### III.

While there is no dispute that the two findings set forth above were made, I believe that the panel majority reads too much into them, *especially when it uses them to make its own third finding.* At first blush the two findings would indicate that Ruffa & Hanover did no more than prepare the offering documents and participate in the solicitation activity of Rodolfy and Welch, which is the sort of conduct by a law firm that the Court in *Pinter* stated ordinarily would not constitute solicitation. *Pinter, supra,* 486 U.S. at —, 108 S.Ct. at 2081.

Rather than eschew the temptation to supply the missing finding of fact—that Ruffa & Hanover did not solicit Wilson—the panel majority barrels ahead with disdain for its proper role as an appellate court and makes its own finding of fact. It does so by stating baldly, "Ruffa & Hanover did not solicit the sale in question". Majority Opinion at 1127. If this is not appellate fact finding, I do not know what is. It is not the business of appellate courts to sift the evidence in order to make needed findings of fact, even if there is adequate evidence to make such findings.

"It may be that adequate evidence as to these matters is in the present record. On that we do not pass, for it is not the function of this Court to search the record and analyze the evidence in order to supply findings which the trial court failed to make."

*Kelley v. Everglades Drainage Dist.,* 319 U.S. 415, 421–22 (1943).

The panel majority's supplying of its own critical finding of fact is unwise for the reason that, in view of what *has* been found by the district court, it is indeed possible that further proper findings may establish that Ruffa & Hanover did solicit Wilson within the meaning of *Pinter.* Clearly, the preparation and sending of the memorandum to Wilson under proper circumstances, would constitute solicitation. For example, if the law firm had a significant role in Saintine Exploration and Drilling Corp. ("Saintine"), its sending of the memorandum to Wilson may have been done more as a principal and "seller" than as a mere "law firm", and it may have been done with the intent to confer financial benefit on itself or on Saintine.[5] Yet what is not clear from the limited present findings by the district court is the relationship between the law firm and the principals of Saintine. We do not know whether the law firm was more heavily involved in Saintine than a lawyer ordinarily would be involved with a client. We do not know what kind of fee arrangement the law firm had with Saintine. There is some suggestion in the trial transcript that Ruffa & Hanover "solicited" investments. These facts would be important, not because they would go to the law firm's involvement in the securities transaction, but because they would help define the law firm's relationship with Wilson—whether the law firm sent the confidential private placement memorandum

---

5. The panel majority describes *Pinter* as defining statutory sellers as "only those who actually solicit the sale of securities for financial gain". Majority Opinion at 1125. It is unclear from this description of *Pinter's* holding as to whether the panel majority also recognizes that not only may one become a statutory seller by soliciting a sale for one's own financial gain, but one can also become a statutory seller by soliciting a sale with the intent to confer a financial benefit on the actual seller.

This second method of becoming a statutory seller could be a basis of potential liability for the law firm in the instant case. The district court *found* that Ruffa & Hanover knew that the confidential private placement memorandum contained a material false statement when the memorandum was sent to Wilson. It at least is arguable that a law firm which solicits the sale of securities through the use of a private placement memorandum containing a material statement that the law firm knows to be false is soliciting the sale with the intent of conferring a financial benefit on the seller. It is obvious that a material false statement most likely is used to obtain a higher price than would be received were the true facts concerning the security known. The difference between the price received through use of the false statement and the price that would have been received had the true facts been known might be the financial benefit needed to bring an otherwise nonactionable solicitation within the ambit of *Pinter.* This is another reason why the instant case should be remanded for proper findings of fact and conclusions of law by the district court.

with the intent to confer a financial benefit on itself or on Saintine.

The reason we do not know these facts is that, prior to *Pinter*, neither the district court nor the parties knew that the question of the solicitation of Wilson by the law firm would become an issue in the case. The Supreme Court has made clear the course an appellate court should follow when the view of the law upon which the district court based its findings of fact has been found to be erroneous. "[W]here findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue." *Pullman–Standard v. Swint*, 456 U.S. 273, 292 (1982) (citing *Kelley v. Southern Pac. Co.*, 419 U.S. 318, 331–32 (1974)).

In view of the critical lack of clarity with respect to the law firm's role in the instant case, I should have thought it not only prudent but mandatory to remand to the district court for specific findings as to the extent of the law firm's participation in the solicitation of sales, including particularly the following:

(1) What the law firm's role was in Saintine, including its fee arrangement.

(2) Whether the law firm itself *sent* the false statement to prospective investors.

(3) Whether the law firm acted as an "agent" of the seller.

(4) Who generated the list of prospective purchasers, i.e., did the list come from the law firm?

(5) Whether the law firm earned a fee from the actual seller for putting out a false and misleading private placement memorandum which enabled, or indeed was a sine qua non for, the seller to induce buyers to buy.

Finally, the panel majority makes much of the fact that at oral argument appellant's attorney stated that a remand was unnecessary because he could think of no further evidence he could offer as to the law firm's participation in the solicitation of Wilson. That both parties and the panel majority would like to avoid a remand, is of no moment. Leaving aside the fact that there are critical aspects of the relationship between the law firm and Saintine that remain unexplored (see the specific areas set forth above as to which the district court should make findings of fact), the parties cannot by agreement dispense with the requirement that a judgment be founded on proper findings of fact. *Swanson v. Levy*, 509 F.2d 859, 861 (9 Cir.1975) ("The requirement that the district court find the facts specially and state separately its conclusions of law must be fairly observed and may not be waived by the parties."); *Waialua Agr. Co. v. Maneja*, 178 F.2d 603, 606–07 (9 Cir.1949) (same) (citing *Kelley v. Everglades Drainage Dist., supra*, 319 U.S. at 421, *cert. denied*, 339 U.S. 920 (1950).

### IV.

To summarize:

From the majority's refusal either to affirm or to remand to the district court to make appropriate findings of fact and conclusions of law in the light of *Pinter*, I respectfully but emphatically dissent.